# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

**SUE EATON,**

        **Plaintiff,**

        **v.**

**MICHAEL J. ASTRUE, COMMISSIONER
OF SOCIAL SECURITY,**

        **Defendant.**

)
)
)
)
)
)
)
)
)
)
)

**Civil Action No. 10-258E**

## MEMORANDUM ORDER

### I. Introduction.

Pending before this Court is an appeal from the final decision of the
Commissioner of Social Security ("Commissioner" or "defendant") denying the claims of
Sue Eaton ("Plaintiff") for Disability Insurance Benefits ("DIB") under Title II of the Social
Security Act ("SSA"), 42 U.S.C. §§ 401 et. seq. and Supplemental Security Income
("SSI") under Title XVI of the SSA, 42 U.S.C. §§ 1381 et. seq. Plaintiff argues that the
decision of the administrative law judge ("ALJ") should be reversed and the
Commissioner directed to award Plaintiff benefits because the ALJ failed to accord due
weight to the opinions of Plaintiff's treating physicians and therefore, the ALJ's
determination is not supported by substantial evidence and she is entitled to DIB and
SSI benefits. To the contrary, Defendant argues that the decision of the ALJ is
supported by substantial evidence and, therefore, the ALJ's decision should be
affirmed. The parties have filed cross motions for summary judgment pursuant to Rule
56(c) of the Federal Rules of Civil Procedure. For the reasons set forth below, the

Court will deny Plaintiff's motion for summary judgment and grant Defendant's motion for summary judgment.

## II. Procedural History.

Plaintiff protectively filed for DIB and SSI on June 24, 2008, (R. at 113,117), claiming that she became disabled and unable to work as of June 14, 2008. (R. at 113, 117). Plaintiff's claims were initially denied at the initial phase of the administrative review process. (R. at 69, 80). A timely written request for a hearing before an ALJ was filed by Plaintiff on October 10, 2008, (R. at 91).

A hearing before the ALJ was held on October 28, 2009. (R. at 39). Plaintiff appeared at the hearing with counsel and testified. (R. at 42-54). At the time of the hearing, Plaintiff was forty-four (44) years old. (R. at 42). Plaintiff testified that she had obtained her GED and that she had past relevant work experience as a child care worker, a sander/finisher in fiberglass manufacturing and a home health care aide. (R. at 42). A vocational expert ("VE"), Linda Augins, also testified at the hearing. (R. at 41).

In his decision, dated November 24, 2009, (R. at 10-19), the ALJ determined that Plaintiff is not under a disability within the meaning of the SSA. (R. at 18). The ALJ also determined that Plaintiff had the following severe impairments: rheumatoid arthritis,[1] depression and obesity. (R. at 12). The ALJ, however, further found that none of these impairments met or were medically equal to one of the Listed Impairments found in the SSA, 20 C.F.R. Part 404, Subpart P, Appendix 1, (R. at 13-14), and that Plaintiff had the

---

[1] Rheumatoid arthritis is defined as: "a generalized disease, occurring more often in women, which primarily affects connective tissue; arthritis is the dominant clinical manifestation, involving many joints, especially those of the hands and feet, accompanied by thickening of articular soft tissue, with extension of synovial tissue over articular cartilages, which become eroded; the course is variable but often is chronic and progressive, leading to deformities and disability." Stedman's Medical Dictionary (27th ed. Lippincott Williams & Wilkins 2000), available at http://www.stedmans.com/AtWork/section.cfm/45.

residual functional capacity ("RFC") to perform a limited range of light exertional work. (R. at 14). Plaintiff filed a timely request to review the ALJ's decision, (R. at 6), which the Appeals Council denied on August 23, 2010. (R. at 1-3).

Plaintiff filed a Motion for Leave to Proceed in forma pauperis before this Court on October 25, 2010. [ECF #1]. The Court granted the Motion on October 29, 2010 [ECF #2] and Plaintiff's Complaint was filed on October 29, 2010, seeking judicial review of the ALJ's determination by this Court. [ECF #3].

## III. Standard of Review.

The Congress of the United States provides for judicial review of the Commissioner's denial of a claimant's benefits. 42 U.S.C. § 405(g). This court must determine whether or not there is substantial evidence which supports the findings of the Commissioner. 42 U.S.C. §405(g). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate." Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995) (quoting Richardson v. Perales, 402 U.S. 389 (1971)). This deferential standard has been referred to as "less than a preponderance of evidence but more than a scintilla." Burns v. Barnhart, 312 F.3d 113, 118 (3d Cir. 2002). This standard, however, does not permit the court to substitute its own conclusions for that of the fact-finder. Id.; Fargnoli v. Massonari, 247 F.3d 34, 38 (3d Cir. 2001) (reviewing whether the administrative law judge's findings "are supported by substantial evidence" regardless of whether the court would have differently decided the factual inquiry).

## IV. Applicable Law.

Under Title II of the SSA, the term "disability" is defined as the:

inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months...

42 U.S.C. §§416(i)(1)(A); 423(d)(1)(A); 20 C.F.R. 404.1505. A person is unable to

engage in substantial activity when she:

is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [s]he lives, or whether a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for work. ...

42 U.S.C. §423(d)(2)(A).

In determining whether a claimant is disabled under the SSA, a five-step

sequential evaluation process must be applied. 20 C.F.R. §404.1520. See McCrea v.

Commissioner of Social Security, 370 F.3d 357, 360 (3d Cir. 2004). The evaluation

process proceeds as follows. At step one, the Commissioner must determine whether

the claimant is engaged in substantial gainful activity for the relevant time periods; if not,

the process proceeds to step two. 20 C.F.R. §404.1520(a)4(i). At step two, the

Commissioner must determine whether the claimant has a severe impairment.

§404.1520(a)(4)(ii). If the Commissioner determines that the claimant has a severe

impairment, it must then determine whether that impairment meets or equals the criteria

of an impairment listed in 20 C.F.R., part 404, subpart p, Appx. 1. §404.1520(a)(4)(iii).

4

If the claimant does not have an impairment which meets or equal the criteria, at step

four the Commissioner must determine whether the claimant's impairment or

impairments prevent her from performing her past relevant work. §404.1520(a)(4)(iv);

Plummer, 186 F.3d at 428.

The claimant bears the burden of demonstrating that she is unable to return to

her past relevant work. Id. (citing Adorno v. Shalala, 40 F.3d 43, 46 (3d Cir.1994)). The

United States Court of Appeals for the Third Circuit has set forth a three step analysis

for determining whether a claimant is capable of performing past relevant work:

> (1) the ALJ must make specific findings of fact as to the claimant's residual
> functional capacity; (2) the ALJ must make findings of the physical and
> mental demands of the claimant's past relevant work; and (3) the ALJ
> must compare the residual functional capacity to the past relevant work to
> determine whether claimant has the level of capability needed to perform
> the past relevant work.

Burnett v. Commissioner of Social Security, 220 F.3d at 120 (citing 20 C.F.R.

§404.1561; S.S.R. 82-62; Winfrey v. Chater, 92 F.3d 1017, 1023 (10th Cir.1996)). See

also Frazier v. Commissioner of Social Security, 240 Fed. Appx. 495, 498 (3d Cir. 2007)

(citing Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981)) (holding that, in determining a

claimant's RFC, the ALJ "must be explicit about what evidence was considered and

what evidence was rejected"). If it is determined that the claimant cannot perform past

relevant work, then the Commissioner must determine, at step five, whether the

claimant can perform other work which exists in the national economy, considering her

residual functional capacity and age, education and work experience. 20 C.F.R.

§404.1520(a)(4)(v). See also McCrea, 370 F.3d at 360; Sykes v. Apfel, 228 F.3d 269,

262-63 (3d Cir. 2000).

5

### V. Plaintiff's Medical History.

#### A. Plaintiff's Medical History Pertaining to her Physical Health.

An x-ray of Plaintiff's right knee was taken on August 9, 2007 due to pain. R. 222. Mild medial marginal spurring was noted as well as a tiny joint space effusion. R. 222. Otherwise there was normal alignment of the bones, no fracture or lytic lesions, the joint space widths were reserved and no loose bodies were identified. R. 222.

An MRI of Plaintiff's left knee was performed on August 29 2007. R. 221. A mild knee joint effusion was demonstrated, as was a partial thickness tear within the cartilage of the medial femoral condyle. R. 221. There also was some degenerative osteophytosis to the most medial and most lateral aspect of the medial tibiofemoral lateral tibiofemoral compartment respectively, some osteophytosis to the patellofemoral joint as well, and some orepatellar bursal fluid seen. R. 221. Impression was small knee joint effusion, partial thickness tear to the cartilage of the medial femoral condyle, additional degenerative changes as described, and prepatellar bursitis. R. 221.

Plaintiff went to the Meadville Medical Center on August 29, 2007 complaining of pain and swelling in her left leg. R. 209. Plaintiff also indicated that she had been having problems with her right knee and difficulty walking. R. 209. Mild tenderness and swelling was located in the posterior aspect of her leg; limited weight bearing secondary to pain was also noted. R. 210. A sonogram was taken of her left leg and was negative. R. 210. Clinical impression was low extremity pain. R. 210.

6

Plaintiff went to the Meadville Medical Center on September 4, 2007 complaining of chest pain. R. 204. Examination showed bilateral 2+ edema of the lower extremities and that lower extremities exhibited normal ROM. R. 204.

On September 10, 2007, Plaintiff was seen at the Conneaut Valley Health Center, Dr. McLaughlin's practice. R. 248. It was noted that Plaintiff was in the emergency room the night before with generalized joint aches, she has significant joint pain and swelling of her hands and feet, muscle strength was 5/5, equal throughout the patient, 1-2+ pitting edema was present, and her hands were quite edematous as well. R. 248. Assessment was joint pain. R. 248.

An undated progress note shows that Plaintiff was seen by Dr. Kevin Kraeling, D.O., of Dr. McLaughlin's office. R. 242. Given the reference to needing to have her referred to a rheumatologist, this note appears to be from approximately late September or early October 2007. R. 242. The progress note indicated that Plaintiff was complaining of swelling through all of her joints, she was in tears in the office, that she is pretty much confined to a wheelchair, and that the symptoms started about two months prior. R. 242. Dr. Kraeling noted that Plaintiff had mild neck pain, but otherwise was doing well, her legs are swelling, and she has pain to palpitation throughout all her joints with 2+ bilateral lower extremity edema. R. 242. Dr. Kraeling began Plaintiff on "Prednisone 60 mg q.d." R. 242.

Plaintiff was seen on October 10, 2007 by Dr. Farooq Hassan, M.D. on a referral from Plaintiff's Primary Care Physician, Dr. McLaughlin. R. 184. Dr. Hassan was a rheumatoid arthritis specialist. R. 184. Dr. Hassan noted Plaintiff has arthralgias,

7

myalgias, fatigue and stiffness, R, 184. Upon examination, the doctor found; (1) no active synovitis in the MCPs, PIPs, wrist, knees, ankles or feet and (2) fair range of motion in all of her joints. R. 185. Dr. Hassan stated: "based on the clinical history and exam and review of recent blood work findings she does have evidence of recent inflammatory arthritis." R. 185.

An undated progress note from Dr. Kraeling states that Dr. Hassan told Plaintiff everything was fine and that Plaintiff wants a second opinion regarding her positive rheumatoid arthritis antigen. R. 239. Given the reference to Plaintiff having seen Dr. Hassan but there being no mention of Plaintiff having seen Dr. Angela Stupi, see below, his note appears to be from late October to late December 2007. No edema was noted. R. 239. Assessment was inflammatory arthropathy. R. 239.

Another undated progress note from Dr. Kraeling indicates that Plaintiff had been seen by a rheumatologist, that Plaintiff said that the prednisone helped remarkably and that she was able to walk after taking it. R. 241. No edema was noted. R. 241. Given the reference to the rheumatologist and feeling better and Prednisone, but not Methotrexate, this note is likely post- October 2007, after Plaintiff saw Dr. Hassan, but pre-January 2008, when Plaintiff began treating with Dr. Stupi. R. 241.

Plaintiff went to the Meadville Medical Center on October 17, 2007 having difficulty swallowing. R. 212. With respect to her extremities, no peripheral cyanosis or edema was noted. R. 212.

On October 22, 2007, x-rays were taken of Plaintiff's wrists, hands, and knees. R. 187-192. Regarding her wrists, no fractures were seen, there were no joint space

8

abnormalities and the appearance of the pronator and navicular fat pads were normal. R. 187-188. Concerning her hands, there were no fractures seen and joint spaces were normal in width and alignment; there were no acute findings. R. 189-190. Concerning her right knee, no fracture was visible, joint spaces were maintained, there was minimal spurring of both tibial plateaus in the medial femoral condyle; impression was "Minimal degenerative changes." R.191. As to Plaintiff's left knee, the x-rays showed no fracture visible, joint spaces maintained and minimal spurring of both femoral condyles. Impression was "Minimal degenerative changes." R. 192.

On December 7, 2007, Plaintiff was seen by Dr. McLaughlin's office complaining of neck pain. R. 240, 245. It was noted that Plaintiff was in no acute distress, but there was some restricted range of motion in her cervical spine and some muscle spasm. R. 240. Assessment was cervical sprain. R. 240.

On December 14, 2007, Plaintiff was seen by Dr. Mercurio of Dr. McLaughlin's office complaining of neck pain and headache for several weeks and some tenderness in the lateral aspect of her right wrist. R. 240. Relative to Plaintiff's extremities, the doctor noted they were well perfused and there was no edema. R. 240. Assessment was cervical somatic dysfunction in the setting of a muscle tension headache. R. 240.

Dr. Angela Stupi, M.D., a rheumatologist, began treating Plaintiff on January 8, 2008. R. 267. In a January 8, 2008 letter to Dr. McLaughlin, Dr. Stupi explained that Plaintiff has very recent onset of inflammatory polyarthritis in her knees, hands, wrists, and shoulders. R. 267. She noted that Plaintiff had blood work done by Dr. Hassan in October 2007 and her sedimentation ("sed") rate was 32. R. 267. She further explained

9

that in the month preceding Plaintiff's visit to Dr. Hassan, which was prior to Plaintiff being placed on Prednisone, her sed rate was 83 and her rheumatoid factor was 1:160. R. 267. Dr. Stupi further explained that x-rays revealed minimal degenerative changes in the right knee, and normal x-rays of Plaintiff's left and right hand and left wrist. R. 267. Dr. Stupi noted that Plaintiff presents at this time with severe inflammatory polyarthritis. R. 267. Upon examination, Plaintiff demonstrated soft tissue swelling and stiffness of the right first, second, and third MCPs, IP and PIPS with significant loss of motion in the wrist. R. 268. Dr. Stupi also noted that there was a questionable right olecranon nodule and limitation of motion in her shoulders. R. 268. Dr. Stupi also noted that on the left side, Plaintiff had swelling of the first, second, and third MCPs, the second and third PIPS, and her wrist, and that Plaintiff's feet revealed painful dorsiplantar flexion bilaterally and diminished left eversion. R. 268. Dr. Stupi concluded that she did believe that Plaintiff has rheumatoid arthritis and also thought it very likely, in light of the positive CCP, that Plaintiff would require a biologic [drug] for full remission. R. 268.

An undated progress note from Dr. Kraeling stated, regarding Plaintiff's rheumatoid arthritis, that she was currently taking Prednisone and Methotrexate[2] and feels much improved; her joint swelling was markedly decreased and her mobility was improved. R. 237. No edema was noted, muscle strength was 5/5 and reflexes were 2/4. R. 237. Again, given the reference to the rheumatologist and Plaintiff taking

---

[2] Methotrexate is "used along with rest, physical therapy and sometimes other medications to treat severe active rheumatoid arthritis (RA; a condition in which the body attacks its own joints, causing pain, swelling, and loss of function) that cannot be controlled by certain other medications." See www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000547/ (last visited January 31, 2012).

10

methotrexate, this note is likely post January 2008, when Plaintiff began treating with Dr. Stupi.

Another undated progress note from Dr. Kraeling stated that Plaintiff "was happy with the rheumatoid treatment and feeling much better with regards to that." R. 236. No edema was noted, muscle strength was 5/5 and reflexes were 2/4. R. 236. Given the reference to treating with a rheumatologist likely this note is from post January 2008, when Plaintiff began treating with Dr. Stupi.

An undated progress note from Dr. Kraeling states that Plaintiff was following with a rheumatologist, was having some mild swelling and flare-up of her symptoms as she was being weaned off of steroids and was complaining of some discoloration of her face, but "[t]he patient, outside of that, has been doing well. No other complaints." R. 235. He then noted that Plaintiff was doing well except for some left mandibular pain or left TJM pain. He noted Plaintiff was in no acute distress and no edema was noted. R. 235. Given the reference to Plaintiff's treating with a rheumatologist, this medical record likely is post-January 2008 when Plaintiff began treating with Dr. Stupi.

An undated progress note from Dr. Kraeling states that Plaintiff has been doing well, she is following up with a rheumatologist who is providing her with excellent care, titrating her Prednisone to achieve great symptomatic control, and that she is doing well except for some left mandibular pain or left TMJ pain. R. 234. Plaintiff was noted to be in no acute distress and no edema was noted. R. 234. Given the reference to Plaintiff's treating with a rheumatologist, this medical record likely is post-January 2008 when Plaintiff began treating with Dr. Stupi.

11

On February 19, 2008, Plaintiff was seen by Dr. Mercurio. R. 233. No edema was noted. R. 233.

A February 29, 2008 progress note from Dr. Stupi states Plaintiff's pain is a 5, stiffness is a 5, fatigue is a 7, sleep is an 8. R. 266. The note further states that Plaintiff was diagnosed with Rheumatoid arthritis in September 2007, that at her last visit she had synovitis throughout and decreased ambulation due to pain and discomfort so Dr. Stupi had decreased her prednisone intake and put Plaintiff on methotrexate. R. 266. "She has noted considerable improvement and is very pleased. She notes that she is able to ambulate much easier and has noted decreased pain and stiffness. Her stiffness is down to 30 minutes each morning and overall she is very pleased with her improvement in pain levels. She continues to have achiness in her right knee and both of her feet, but has noted improvement in her hands. R. 266. Dr. Stupi noted that blood work done on February 11, 2008 showed Plaintiff's sedimentation rate to be 24. R. 266. Upon examination, Dr. Stupi noted hands with synovitis at MCP and PIP joints, also continued to have warmth in the wrists bilaterally; elbows and shoulders had good range of motion; hips had good range of motion; right knee continued to have slight warmth; and ankles also had mild synovitis. R. 266. Dr. Stupi's assessment was rheumatoid arthritis CCP positive; doing well on prednisone and methotrexate. R. 266.

On April 14, 2008, an x-ray of Plaintiff's left foot was taken. R. 214. Noted was normal alignment of the bones, no fractures or lytic lesions identified, the joint spaces were intact throughout, no areas of periosteal reaction were seen and no foreign bodies identified. R. 214.

12

A May 7, 2008 progress note from Dr. Stupi notes that Plaintiff suffers from rheumatoid arthritis with CCP positive. R. 265. The note further indicated that Plaintiff rated her pain a 10, stiffness a 10, fatigue an 8, and sleep a 10. R. 265. Petitioner told Dr. Stupi that she has not been doing well, recently she has had considerable increase in swelling and stiffness in her hands, shoulders, hips, knees and feet, her right knee is very severe and gives her difficulty with ambulation due to pain, and she has a lot of warmth at the joint with significant stiffness. R. 265. It was also noted that Plaintiff initially did well on higher doses of prednisone, but over the last couple of weeks has really not been doing very well; R. 265. She denied any new joints bothering her. R. 265. Upon examination of Plaintiff, Dr. Stupi noted hands with active synovitis across all MCPs and PIP joints; tender joint count 18+; swollen joint count 18; wrists with warmth bilaterally; elbows and shoulders are with good range of motion, although stiffness is apparent; right knee with warmth; no signs of effusion; ankles slightly warm as well. R. 265. Dr. Stupi noted that blood work done on March 13, 2008 showed Plaintiff's sedimentation rate to be 35 and blood work done on April 15, 2008 showed it to be 52. R. 265. Dr. Stupi concluded that Plaintiff was "CCP-positive rheumatoid arthritis with increasing synovitis on examination." R. 265. She prescribed more prednisone and the continuation of methotrexate. R. 265. Dr. Stupi also noted that Plaintiff had right knee synovitis; she injected Plaintiff's knee at the office; "hemostasis was achieved." R. 265.

A June 28, 2008 progress note from Dr. Stupi states that Plaintiff's active problems included: rheumatoid arthritis with positive rheumatoid factor, CCP, increased

13

sed rate, normal C3, C4, SPEP, negative ANA, Lyme, Parvovirus, and hepatitis panel; hyperuricemia, and OA of the right knee. R. 264. Dr. Stupi noted that blood work done on May 16, 2008 showed Plaintiff's sedimentation rate to be 34 and blood work done on June 18, 2008 showed it to be 28. R. 264. Dr. Stupi further noted that Plaintiff continues on methotrexate and prednisone in a steady dose, but continues to have swelling in her hands and elbows. R. 264. On examination, Dr. Stupi noted tender joints at the right second MCP and PIP, and the fifth PIP, left third, fourth and fifth MCPs and the fourth and fifth PIPS, bilateral wrists, and bilateral elbows, bilateral second and third MIPS. R. 264. Dr. Stupi also noted that Plaintiff has been able to increase her activities as she has been treated with the prednisone and methotrexate. R. 264. The doctor also noted swelling at the second and third MCPs and third BIP (trace). R. 264. Her assessment was rheumatoid arthritis. R. 264.

On July 28, 2008, Dr. Stupi noted that at Plaintiff's last exam, she had a normal gait, her left grip was 19.5 and her right grip was 20.0. R. 263.

An August 11, 2008 Progress Note from Dr. Stupi provided in relevant part that Plaintiff's active problems included: "rheumatoid arthritis with positive rheumatoid factor, CCP, increased sed rate...." R. 304. The Progress Note also stated that since her last visit, Eaton's pain was a 7/10, stiffness was a 5/10, fatigue was an 8/10 and sleep problems was a 5/10. R. 304. Further: "Sue relates that her joints are feeling 'excellent'. She has pain only in the left shoulder (7/10). She states that, for the past month, she has had painful ROM, and she noticed this most with maneuvers of internal rotation. To put her arm over her head, she practically has to lift it. Also she continues with left TMJ

14

discomfort." R. 304. No edema was also noted. R. 304. Under "Assessment & Plan," Dr. Stupi noted that with respect to Eaton's rheumatoid arthritis: "Overall improved on her current regimen. The patient feels that she is probably on [study] drug [as opposed to placebo] since she is doing so well." R. 304.

An undated progress note from Dr. Kraeling states that Eaton presented for her routine follow-up and that "[s]he has been doing well. She also has rheumatoid arthritis and is following with a rheumatologist and is getting excellent results under her care." R. 356. No edema was noted. R. 356. Muscle strength was 5/5 and reflexes were 2/4. R. 356.

An August 25, 2008 handwritten note from Dr. McLaughlin states that Eaton's shoulder pain continues. R. 353. The progress note also indicated that Eaton came for follow-up of her hypertension and hyperlipidemia, that "[s]he is doing well," and that there was no edema. R. 354.

A September 8, 2008 progress note from Dr. McLaughlin states that Eaton was in because of left shoulder pain. R. 355. Her history of rheumatoid arthritis was noted and that Eaton "reports this is something different than that." R. 355. On exam, her left shoulder showed restricted range of motion secondary to pain. R. 355.

On September 8, 2008, an x-ray was done of Eaton's left shoulder. R. 312. Found was "[s]ome minimal degenerative osteophytosis demonstrated acromioclavicular joint. No fracture or dislocation, no lytic or blastic process." R. 311. Impression was "Minimal degenerative changes." R. 312.

15

On September 10, 2008, an MRI was done of Eaton's left shoulder. R. 311. Findings were that "[t]here is a normal alignment of the bones of the left shoulder and no marrow signal abnormalities are identified. The rotator cuff is intact on all pulse sequences and no fluid is identified within the subacrimial/subdeltoid bursa. The glenoid labra are intact throughout. No periarticular collections or masses are identified." R. 311. Impression was "Normal MRI of the left shoulder." R. 304.

A December 10, 2008 progress note from Dr. McLaughlin states that Eaton reported that her "Activity level is normal." R. 352.

On December 29, 2008, a progress note from Dr. Mercurio indicated that Eaton presented with abdominal and lower back pain. R. 350. Without edema was noted. R. 350.

A May 8, 2009 progress note from Dr. Stupi noted Plaintiff's active problems to include: "rheumatoid arthritis with positive rheumatoid factor, CCP, increased sed rate" and OA of right knee." R. 420. Dr. Stupi noted that blood work done on December 17, 2008 showed Plaintiff's sedimentation rate to be 34, blood work done on January 17, 2009 showed it to be 35, blood work done on January 21, 2009 showed it to be 53, and blood work done on April 8, 2009 showed it to be 36. R. 420. It was noted that Plaintiff was on week 40 of her drug study and that she "will become open label in three weeks." R. 420. Since her last visit, pain was a 7/10, stiffness was a 5/10, fatigue was a 9/10 and sleep problems was a 9/10. R. 420. Dr. Stupi also noted that Patient states that she is aching, and she always knows when she is due for an infusion. She is not due for another three weeks. On this interval, she had a kidney/bladder infection, and was

16

hospitalized for five days. The MTX was placed on hold. She also underwent a D&C on two instances." R. 420. No edema was noted. R. 420. On physical examination, Dr. Stupi found painful ROM bilateral shoulders and minimal soft tissue swelling of small joints on Plaintiff's hands were noted. R. 420. Plaintiff was to be tapered off her prednisone because it was significantly elevating her blood sugars. R. 420.

### B. Plaintiff's Medical History Pertaining to her Mental Health.

A progress note from The Primary Health Network ("Primary Health") dated May 11, 2009 indicated that this was Plaintiff's initial mental health counseling session and that she was experiencing physical pain "everywhere" daily, the pain being a 7 out of 10. R. 387. R. 385. It further notes that Plaintiff was seeking counseling due to grief and loss issues due to her mother's death. R. 385. She also was having difficulty coping with multiple medical stressors. R. 387. The assessment was that her mood was depressed and her affect was appropriate. R. 387.

A progress note from Primary Health dated May 18, 2009 indicated that Eaton's affect was appropriate, her thought process was normal, her concentration, cognition and memory were within normal limits, her thought content was normal, and her mood was depressed. R. 391. It was also noted that she was experiencing physical pain from her rheumatoid arthritis and that the pain was a 3 out of 10. R. 391.

An Adult Psychosocial Assessment was conducted by Primary Health on May 20, 2009. R. 389. Presenting problems included that she was separated, she was experiencing depression, she had grief and loss issues due to loss of her mother and she had difficulty coping with multiple medical stressors. R. 389.

17

A Mental Status Exam was conducted by Primary Health on May 20, 2009; it indicated that Eaton's mood was depressed, her affect was sad and tearful, her thought process was logical and coherent, her thought content focused on medical stressors, her cognitive functioning was normal and her insight was fair. R. 388. Her current GAF was listed as 65; her highest GAF in the past year was a GAF of 70, and her lowest GAF in the last year was a GAF of 40.[3] R. 388. The recommendation was that Eaton be seen for 1-on-1 counseling for 10-12 sessions with a focus on grief and loss issues and coping with medical stressors. R. 388.

A progress note from Primary Health dated June 15, 2009 stated that Plaintiff had done well on paxil and her depression has lifted. R. 386. Her affect was found to be appropriate, her thought process to be organized, and her cognition, memory and concentration to be within normal limits. R. 386. Her mood was noted to be bright. R. 386. It was also noted that she was experiencing physical pain from her rheumatoid arthritis and that the pain was a 4 out of 10. R. 386. She was to come back for a follow-up appointment in 8 weeks. R. 386.

Another progress note from Primary Health, dated June 17, 2009, indicates that Eaton's mood remained depressed and her affect appropriate. R. 387. She was to follow-up in two or three weeks' time and continue medication compliance. R. 387.

A progress note from Primary Health dated July 15, 2009 indicated that Eaton was currently experiencing physical pain in her feet daily; pain was a 6 out of 10. R.

---

[3] The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders (DSM–IV–TR) 34 (4th ed.2000). An individual with a GAF score of 61–70 may have "[s]ome mild symptoms" or "some difficulty in social, occupational, or school functioning, but generally functioning pretty well" and "has some meaningful interpersonal relationships" and of 31–40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood." Id.

385. It was noted that the one year anniversary of Plaintiff's mother's death was approaching and that her mood was depressed, and her affect was sad and tearful. R. 385. It was also noted that Plaintiff was experiencing ongoing family stressors. R.385.

A progress note from Primary Health dated September 16, 2009 states under subjective that Eaton is more depressed because of physical issues. R. 384. She presented as depressed, her affect was appropriate, her thought process was organized, and her cognition, memory and concentration were within normal limits. R. 384. It was also noted that Plaintiff reported that she was currently experiencing physical pain all over her body. R. 384. She was to return in four weeks. R. 384.

On September 28, 2009, Dr. Tariq Quesrshi of Primary Heath completed a Medical Source Statement. In the Statement, Dr. Quesrshi indicated that Plaintiff's restrictions with respect to her ability to follow work rules, relate to co-workers, deal with the public, use judgement, interact with supervisor(s), deal with work stresses, function independently, and maintain attention/concentration were all "marked." R. 392. "Marked" was defined as meaning "There is serious limitation in this area. The ability to function is severely limited, but not precluded." R. 392. Dr. Quesrshi's stated basis for these limitations was that Plaintiff had initially been seen on April 20, 2009 complaining of severe depression because of chronic health issues, that she had been given a trial of Zoloft which did not help nor did Paxil. R. 392. The doctor further stated that Plaintiff's restrictions with respect to her ability to understand, remember and carry out complex job instructions and her ability to understand, remember and carry out detailed, but not complex, job instructions was marked, and that her ability to understand, remember and

19

carry out simple job instructions was "moderate." R. 393 "Moderate" was defined as "There is a moderate limitation in this area but the individual is still able to function satisfactorily." R. 392. As support for these conclusions, he stated: "multiple physical illness and superimposed depression will be an impediment in gainful employment." R. 393. Dr. Quesrshi also concluded that restrictions on Plaintiff's ability to maintain personal appearance was slight, on her ability to behave in an emotionally stable manner was moderate, on her ability to relate predictably in social situations was marked and on her ability to demonstrate reliability was moderate. R. 393. "Slight" was defined as meaning "There is some mild limitation in this area, but the individual can generally function well." R. 392. The doctor's basis for these findings was the same as for the two previous categories. R. 393. Finally, with respect to Plaintiff's ability to sustain work-related activities, Dr. Quesrshi concluded that "[a]s a result of his/her mental health related impairments, this individual is limited to: 'this individual is not capable of sustaining competitive work activity'." R. 394.

## VI. ALJ Decision.

After the hearing, the ALJ rendered the following findings in his Decision:

1. Plaintiff met the insured status requirements of the Social Security Act ("SSA") through December 31, 2012;

2. Plaintiff has not engaged in substantial gainful activity since June 14, 2008;

3. Plaintiff has the following severe impairments of rheumatoid arthritis, obesity, and depression;

20

4. Plaintiff does not have an impairment or combination of impairment that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. Plaintiff has the residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently, to sit for 8 hours during an 8-hour workday; to walk and stand for 6 hours during an 8-hour workday; she must avoid tasks requiring the ability to climb or work at unprotected heights or around dangerous machinery; she must avoid pushing and pulling of more than 10 pounds occasionally; she can perform simple, repetitive job tasks in a low stress environment; she has gross use of her hands, but she should not engage in frequent grasping.

6. Plaintiff is unable to perform any past relevant work;

7. Plaintiff was 42 years old on the alleged disability onset date and so is considered a younger individual under the SSA;

8. Plaintiff has at least a high school education and can communicate in English;

9. The transferability of job skills was not material to the determination of disability because using the Medical-Vocational Rules as a framework supported a finding that the Plaintiff was "not disabled" whether or not Plaintiff has transferrable job skills;

10. Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform; and

21

11. Plaintiff has not been under a disability, as defined in the SSA, from June 14, 2008, through the date of the ALJ's decision, November 24, 2009.

R. 12-14, 17-18.

With respect to her severe impairments, the ALJ concluded that the medical evidence established that Plaintiff has impairments, rheumatoid arthritis, obesity, and depression, which significantly affect her ability to perform basic work functions such as lifting, carrying, standing, walking, and sustaining concentration to carry out detailed instructions. R 12. He further concluded that with respect to diabetes mellitus, the medical evidence did not support that said impairment was severe. R 13.

With respect to Plaintiff's rheumatoid arthritis, the ALJ concluded that the medical evidence did not support gross anatomical deformity and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s) resulting in inability to ambulate effectively or to perform fine or gross movements effectively as defined in section 1.02 of the listings. R 13. Additionally, the ALJ concluded that the medical evidence failed to support that Plaintiff's obesity has increased the severity of any other coexisting or related impairment to the extent that the combination of impairments meets the requirement of a listing. R 13.

With respect to Plaintiff's depression, the ALJ concluded that in activities of daily living, Plaintiff has mild restrictions. R 13. Mentally, she is capable of managing within a basic routine: "The evidence fails to support that the claimant is unable to meet personal needs, prepare simple meals or perform routine chores." R 13. Concerning social functioning, the ALJ concluded that Plaintiff has mild difficulties: "Treatment evidence

22

fails to support that the claimant is unable to interact and relate appropriately with

others." R 13. With respect to concentration, persistence or pace, the ALJ concluded

Plaintiff has moderate difficulties: "The evidence supports that claimant can understand

and execute simple instructions, make simple decisions, and set simple goals." R 13.

Finally, the ALJ found that Plaintiff has not experienced any episodes of

decompensating which have been of extended duration. R 13.

The ALJ also concluded after consideration of the evidence of record that

Plaintiff's medically determinable impairments could reasonably be expected to cause

the alleged symptoms, but that Plaintiff's statements concerning the intensity,

persistence and limiting effects of these symptoms are not credible to the extent they

are inconsistent with the ALJ's residual functional capacity assessment. R 15.

In support of his residual functional capacity assessment and his conclusion that

Plaintiff is not disabled, the ALJ states:

> Progress notes from Dr. Frank McLaughlin, D.O.[4], on May 7, 2008 support
> follow-up for rheumatoid arthritis with complaints of stiffness, fatigue and
> poor sleep. The claimant reported considerable increase in swelling and
> stiffness on her hands, shoulders, hips, knees and feet. On physical
> examination, the hands had active synovitis. The tender joint count and
> swollen joint count were 18; however, the elbows and shoulders had good
> range of motion, although stiffness was apparent. The right knee was
> warm and the ankles were slightly warm as well. Prednisone was
> increased to 5 mg and continued on Methotextrate and Darvocet as
> needed. Progress notes in January 2009 [by Dr. McLaughlin] support only
> mild tenderness throughout. [5]
>
> In January 2008, x-rays show minimal degenerative changes in the right
> knee and no abnormalities in the left or right hand or left wrist. On
> examination, the claimant had soft tissue swelling and stiffness of the right

---

[4] Actually this progress note is from Plaintiff's treating rheumatologist Dr. Angela Stupi M.D.. See R. 265.
[5] Upon review of the progress note in question, the doctor's observation that "[s]he does have some mild tenderness throughout" was in relation to her abdomen, not a part of Plaintiff's body she contends is effected by rheumatoid arthritis. See R.348

23

1st through 3rd metacarpophalangeal joints, distal interphalangeal joints and proximal interphalengeal joints with significant loss of motion in the wrist. The claimant's weight was recorded at 218 pounds in June 2008. Progress notes indicate she was started on Methotextrate and Prednisone.

In July 2008, Dr. Stupi reported that the claimant had a normal gait on her last examination and that her grip strength was 19.5 on the left and 20.0 on the right (88% and 81% of average). In a medical source statement, dated October 5, 2009, Angela Stupi, M.D., opined that the claimant can sit for 4 hours and stand and walk for 2 hours. Dr. Stupi reported additionally that the claimant can sit for 2 hours, stand for 1 hour and walk for less than 30 minutes without having to lie down. In addition, it was noted that the claimant can lift and carry up to 10 pounds frequently and up to 20 pounds occasionally. Dr. Stupi further opined that the claimant can use her hands and arms for simple grasping and reaching. Occasionally, she can bend, squat, stoop or reach above shoulder level; however, she can never kneel and crawl. In addition, the claimant can be exposed frequently to noise and vibration and occasionally to moving machinery, extreme temperatures and dust, fumes and gases; however, she can never work at unprotected heights. Dr. Stupi averred that the claimant may have pain to such an extent as to be distracting to adequate performance of daily activities or work and that repetitious use of the hands and arms greatly increase pain causing abandonment of tasks related to daily activities or work.

Dr. Stupi further indicated that the claimant is only capable of only part-time work activity with these limitations for 4 hours per day, 3 to 5 days per week.  . . .  The overall evidence supports that medications have been effective in controlling the claimant's symptoms. Accordingly, this assessment has been afforded moderate weight; however, it has not been adopted in its entirety.

The medical evidence supports that the claimant was seen initially at Stairways Behavioral Health on April 20, 2009. Although a medical source statement [by Dr. Quesrshi] supports that the claimant is not capable of sustaining competitive work activity due to marked limitations in her abilities to follow work rules, relate to co-workers, deal with the public, use judgment, interact with supervisors, deal with work stressors, function independently, maintain attention and concentration and understand, remember and carry out complex or detail job instructions, these findings are not consistent with the overall evidence of record. The evidence supports six months of medication treatment. There is no evidence to support that the claimant has required inpatient psychiatric hospitalization.

. . . In the case at hand, the physical assessment of the Disability Determination Services medical consultant [Dr. Fox] has been afforded significant weight because it is consistent with the overall evidence of record; however, additional evidence regarding depression was received subsequent to the State agency assessment.

Clearly the objective medical evidence fails to support limitations that would preclude the performance of all work activity. All treating sources have been considered and there is no detailed, clinical and/or diagnostic evidence in the case record to support work disabling limitations as alleged. Progress notes support good response to treatment and the claimant is able to participate in in daily activities such as caring for her personal need, performing routine chores, shopping and driving a car. Moreover, she has not required inpatient psychiatric hospitalization and she is essentially stable on medication. There is no evidence to support worsening of symptoms and no indication of adverse medication side effects, which would impair her ability to work, particularly to the degree alleged.

R. 15-17 (citations to Exhibits omitted).

The ALJ also explained that he asked the vocational expert ("VE") whether jobs existed in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. R 18. The VE's response was that given all of these factors, such a person would be able to perform the requirements of the following unskilled, light occupation - rental clerk - and the following unskilled sedentary occupations - surveillance system monitor and telephone info clerk. R 18.

The ALJ also noted that Plaintiff's attorney proposed additional limitations to the vocational expert but that "the objective evidence clearly fails to support limitations beyond those previously determined." R 18.

Ultimately, the ALJ concluded "[b]ased on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work

25

experience, and residual functional capacity, the claimant is capable of making a

successful adjustment to other work that exists in significant numbers in the national

economy. A finding of 'not disabled' is therefore appropriate...." R 18. The ALJ also

provided a list of the exhibits he reviewed. See R. 20-23.

## VII. Pending Cross Motions for Summary Judgment.

In her Brief in Support of Motion for Summary Judgment, Plaintiff contends that

the ALJ's Decision was incorrect and that the Court should reverse the Defendant's

decision not to award Plaintiff DIB and SSI benefits, and award these benefits to

Plaintiff. In support of her position, Plaintiff contends :

> Eaton maintains that the [ALJ] committed a significant error in failing to
> accord due weight to the stated opinions of her treating physicians. In so
> doing, the [ALJ] failed to point to other medical evidence of record
> contradicting these opinions which would support the [ALJ's] factual
> findings. Because the [ALJ's] finding with respect to Eaton's residual
> functional capacity is a result of these failings, the Commissioner's
> Adverse Decision lacks substantial evidence in its support.  . . . In the
> absence of medical evidence supporting the conclusion that Eaton
> retained the capacity to perform other full-time occupations, the
> Commissioner has not shouldered his burden.

Brief in Support of Plaintiff's Motion for Summary Judgment ("Plaintiff's Supporting

Brief"), p. 13.

In response, and in support of his motion for summary judgment, the Defendant

contends in general that "the objective evidence of record, including Plaintiff's diagnostic

tests, treatment regime, and her treating physician's own notes, is inconsistent with her

treating physicians' opinions." Defendant's Brief in Support of Motion for Summary

Judgment ("Defendant's Supporting Brief"), p. 1.

26

With respect to Dr. Angela Stupi's opinion, Plaintiff's treating physician for her rheumatoid arthritis, the Commissioner further argues that to the extent that Dr. Stupi expressed an opinion with respect to Plaintiff's residual functional capacity or to Plaintiff being disabled under the SSA, those determinations are reserved solely to the Commissioner and not to treating physicians. Defendant's Supporting Brief, pp. 12-13. Second, the Defendant contends that the ALJ did not have to give enhanced weight to Dr. Stupi's opinion because her opinion was inconsistent with her own treatment notes and was inconsistent with other substantial evidence in the record. Id. at p. 14.

Concerning Dr. Tariq Quesrshi 's opinion, Plaintiff's treating physician for her depression, Defendant contends that nothing in Dr. Quesrshi's opinion, nor otherwise in the record, supports the conclusion that Plaintiff's depression must have lasted or been expected to last 12 consecutive months. Id. at p. 16. Further, the Defendant contends that the "scant evidence in the record concerning Plaintiff's alleged depression undercuts Dr. Quesrshi's opinion." Id. at p. 17.

Finally, the Commissioner contends that the ALJ did not err by excluding some of the limitations identified by Drs. Stupi and Quesrshi from the RFC assessment/ hypothetical questions posed to the VE because the record as a whole does not support these opinions. Id. at p. 18.

*VIII. Legal Analysis.*

### A. ALJ's treatment of opinions of treating physicians Dr. Angela Stupi., M.D. and Dr. Tariq Quesrshi, M.D.

It cannot be disputed that the question of whether a person is disabled is a legal one that is reserved to the Commissioner of Social Security. 20 C.F.R. §404.1527(d)(2). Nonetheless, as the Third Circuit court has specifically recognized, the opinion of the plaintiff's treating physician is to be afforded significant weight. See Fargnoli v. Massanari, 247 F.3d 34, 43 (3d Cir.2001); Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir.1999) (citing 20 C.F.R. § 404.1527). In fact, the regulations provide that a treating physician's opinion is to be given "controlling weight" so long as the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2); Fargnoli, 247 F.3d at 43; Plummer, 186 F.3d at 429. As a result, the ALJ may reject a treating physician's opinion outright only on the basis of contradictory medical evidence, and not on the basis of the Commissioner's own judgment or speculation, although he may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided. Plummer, 186 F.3d at 429.

With this applicable law in mind, we turn first to the ALJ's treatment of the opinion of Dr. Angela Stupi, M.D., Plaintiff's treating rheumatologist. On October 5, 2009 Dr. Stupi completed a Medical Source Statement. R. 421-423. She concluded: (1) in an 8 hour day, plaintiff could sit for 4 hours, stand and walk for 2 hours; (2) she should be able to sit for 2 hours without having to stand, walk, or lie down, stand for 1 hour without

having to sit, walk, or lie down, and walk for less than 30 minutes without having to stop and rest; (3) she could frequently lift up to 10 pounds, occasionally lift 11-20 pounds, and never lift 21 pounds or more; (4) she could frequently carry up to 10 pounds, occasionally lift 11-20 pounds, and never lift 21 pounds or more; (5) she should be able to use both hands and arms for simple grasping and reaching; (6) she can occasionally bend, squat, stoop or reach above shoulder level, but never kneel or crawl; (7) she could frequently be exposed to noise and vibration, occasionally could be exposed to moving machinery, extreme temperatures, dust, fumes, and gases, and could stoop, and never could be exposed to unprotected heights; (8) pain was present to such an extent as to be distracting to adequate performance of daily activities or work; and (9) repetitious use of the hands and arms greatly increases pain causing abandonment of tasks related to daily activities or work. R. 422-423. Dr. Stupi concluded that Plaintiff was only capable of part-time work activity within the limitations expressed above for 4 hours a day and 3-5 days per week. R. 423.

In *toto*, the ALJ's analysis of Dr. Stupi's opinion as set forth in her October 5, 2009 Medical Source Statement is as follows: "[t]he overall evidence supports that medications have been effective in controlling the claimant's symptoms. Accordingly, this assessment has been afforded moderate weight." R. 16. The ALJ also cited to Exhibits B-19F, B-23F, and B-24F.

Exhibit B-19F is an October 3, 2009 Narrative Assessment authored by Dr. Stupi as the request of Plaintiff's counsel. The report stated:

She first presented to the office 1/1/08, with an aggressive onset of inflammatory polyarthritis involving her knees, hands, wrists, and

29

shoulders. Her evaluation revealed a positive rheumatoid factor, CCP antibody, and nodular inflammatory arthritis, all of which are aggressive prognostic factors for her disease activity. Based on this, she was placed on MTX for disease modification, prednisone to diminish the intensity of her inflammation, and subsequent biologic medication. . . . She began the FEATURE study beginning 6/25/08. This study involved ocrelizumab . . . . The patient continues on study, but has had many complications regarding her disease course. The complications have included a kidney/bladder infection regarding five days hospitalization. During that period, the patient needed to have medications placed on hold. She also had a D&C on two separate instances for a known diagnosis of endometriosis. More recently, she was hospitalized for diabetes mellitus out of control. This is a consequence of the corticosteroids she requires to suppress inflammation of her rheumatoid arthritis. . . . thus far [as a result of Plaintiff's participation in study] we have not seen a significant response, in that she has significant pain and stiffness accompanied by soft tissue inflammation involving her hands; wrists, feet, knees, and limitation of motion in her shoulder. For this reason, repetitive grasping, and fine dexterity are often difficult. Reaching or pushing/pulling heavy loads are difficult, and the patient should have weight limitations not to exceed 20-lbs. As you are likely aware, this has become problematic not only for gainful employment, but also for managing her own activities of daily living and care of her children.

It is my medical opinion to the best of medical certainty, that this patient cannot be gainfully employed full time and continuously. I have outlined my limitations on the medical source statement. I am hopeful that with time, Mrs. Eaton may be able to achieve better control/remission of her rheumatoid arthritis, but would place her prognosis as guarded at this time, based on the minimal benefits thus far we have achieved.

R. 395-96.

Exhibit B-23F is a May 2009 Progress Note from Dr. Stupi. It noted that Plaintiff

suffers from rheumatoid arthritis with CCP positive. R. 265. The note further indicated

that Plaintiff rated her pain a 10, stiffness a 10, fatigue an 8, and sleep a 10. R. 265.

Petitioner told Dr. Stupi that she has not been doing well, recently she has had

considerable increase in swelling and stiffness in her hands, shoulders, hips, knees and

feet, her right knee is very severe and gives her difficulty with ambulation due to pain,

30

and she has a lot of warmth at the joint with significant stiffness. R. 265. It was also noted that Plaintiff initially did well on higher doses of prednisone, but over the last couple of weeks has really not been doing very well; R. 265. She denied any new joints bothering her. R. 265. Upon examination of Plaintiff, Dr. Stupi noted hands with active synovitis across all MCPs and PIP joints; tender joint count 18+; swollen joint count 18; wrists with warmth bilaterally; elbows and shoulders are with good range of motion, although stiffness is apparent; right knee with warmth; no signs of effusion; ankles slightly warm as well. R. 265. Dr. Stupi noted that blood work done on March 13, 2008 showed Plaintiff's sedimentation rate to be 35 and blood work done on April 15, 2008 showed it to be 52. R. 265. Dr. Stupi concluded that Plaintiff was "CCP-positive rheumatoid arthritis with increasing synovitis on examination." R. 265. She prescribed more prednisone and the continuation of methotrexate. R. 265. Dr. Stupi also noted that Plaintiff had right knee synovitis; she injected Plaintiff's knee at the office; "hemostasis was achieved." R. 265.

Exhibit B-24F is the above summarized October 5, 2009 Medical Source Statement authored by Dr. Stupi.

First, contrary to Plaintiff's contention, the ALJ did point to other medical evidence of record. In his Decision, he explained that "[t]he overall evidence supports that medications have been effective in controlling the claimant's symptoms." R. 16. He also cited to Dr. Stupi's October 3, 2009 Narrative Assessment and her May 2009 progress note. R. 16. That was sufficient.

31

Moreover, upon review of the objective medical evidence in the record relevant to Plaintiff's rheumatoid arthritis, which we have already summarized above and need not repeat, we find that Dr. Stupi's opinion was not well-supported by medically acceptable clinical and laboratory diagnostic techniques and was inconsistent with other substantial evidence in the record. Therefore, the ALJ did not err when he concluded that Dr. Stupi's opinion was not entitled to controlling weight, but rather, only moderate weight.

We turn next to the ALJ's analysis of the opinion of Plaintiff's treating psychiatrist Dr. Tariq Quesrshi, M.D. of The Primary Health Network ("Primary Health"). On September 28, 2009, Dr. Quesrshi completed a Medical Source Statement with respect to Plaintiff. In the Statement, Dr. Quesrshi indicated that Plaintiff's restrictions with respect to her ability to follow work rules, relate to co-workers, deal with the public, use judgement, interact with supervisor(s), deal with work stresses, function independently, and maintain attention/concentration were all "marked." R. 392. "Marked" was defined as meaning "There is serious limitation in this area. The ability to function is severely limited, but not precluded." R. 392. Dr. Quesrshi's stated basis for these limitations was that Plaintiff had initially been seen on April 20, 2009 complaining of severe depression because of chronic health issues, that she had been given a trial of Zoloft which did not help nor did Paxil. R. 392.

Dr. Quesrshi further stated that Plaintiff's restrictions with respect to her ability to understand, remember and carry out complex job instructions and her ability to understand, remember and carry out detailed, but not complex, job instructions was marked, and that her ability to understand, remember and carry out simple job

32

instructions was "moderate." R. 393 "Moderate" was defined as "There is a moderate limitation in this area but the individual is still able to function satisfactorily." R. 392. As support for these conclusions, he stated: "multiple physical illness and superimposed depression will be an impediment in gainful employment." R. 393.

Dr. Quesrshi also concluded that restrictions on Plaintiff's ability to maintain personal appearance was slight, on her ability to behave in an emotionally stable manner was moderate, on her ability to relate predictably in social situations was marked and on her ability to demonstrate reliability was moderate. R. 393. "Slight" was defined as meaning "There is some mild limitation in this area, but the individual can generally function well." R. 392. The doctor's basis for these findings was the same as for the two previous categories. R. 393.

Finally, with respect to Plaintiff's ability to sustain work-related activities, Dr. Quesrshi concluded that "[a]s a result of his/her mental health related impairments, this individual is limited to: 'this individual is not capable of sustaining competitive work activity'." R. 394.

The ALJ concluded with respect to this opinion by Dr. Quesrshi that:

Although a medical source statement [by Dr. Quesrshi] supports that the claimant is not capable of sustaining competitive work activity due to marked limitations in her abilities to follow work rules, relate to co-workers, deal with the public, use judgment, interact with supervisors, deal with work stressors, function independently, maintain attention and concentration and understand, remember and carry out complex or detail job instructions, these findings are not consistent with the overall evidence of record. The evidence supports six months of medication treatment. There is no evidence to support that the claimant has required inpatient psychiatric hospitalization.

R. 16.

33

First, again contrary to Plaintiff's contention, the ALJ did point to other medical evidence of record. He explained that "[Dr. Quesrshi's] findings are not consistent with the overall evidence of record. The evidence supports six months of medication treatment. There is no evidence to support that the claimant has required inpatient psychiatric hospitalization." R. 16. That was sufficient.

Moreover, upon review of the objective medical evidence in the record relevant to Plaintiff's depression, which we have already summarized above and need not repeat, we find that Dr. Quesrshi's opinion was not well-supported by medically acceptable clinical and laboratory diagnostic techniques and was inconsistent with other substantial evidence in the record. Therefore, the ALJ did not err when he concluded that Dr. Stupi's opinion as not consistent with the overall evidence of record and did not give it controlling weight.

### B. Whether there is substantial evidence to support the ALJ's findings as to Plaintiff's Residual Functional Capacity and disability under the Act.

"'Residual Functional Capacity is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" Fargnoli v. Massanari, 247 F.3d 34, 40 (3d Cir. 2001) (quoting Burnett v. Commissioner of Social Security, 220 F.3d 112, 121 (3d Cir. 2000)) (quotations omitted); 20 C.F.R. §404.1525(a)(1). We find that there is substantial evidence to support the ALJ's findings that: (1) Plaintiff had the residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently, to sit for 8 hours during an 8-hour workday; to walk and stand for 6 hours during an 8-hour workday; she must avoid tasks requiring the ability to climb or work at

34

unprotected heights or around dangerous machinery; she must avoid pushing and pulling of more than 10 pounds occasionally; she can perform simple, repetitive job asks in a low stress environment; and she has gross use of her hands, but she should not engage in frequent grasping; (2) considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform; and (3) she was not disabled for the time period relevant to her application for benefits, are all supported by substantial evidence in the record.

## IX. Conclusion.

Plaintiff's motion for summary judgment is denied and Defendant's motion for summary judgment is granted. An appropriate order follows.

February __6__, 2012

_Maurice B. Cohill, Jr._
Maurice B. Cohill, Jr.
Senior United States District Judge